J-S40030-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: ADOPTION OF M.B.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 519 WDA 2019 |

Appeal from the Order Entered March 12, 2019
In the Court of Common Pleas of Venango County Orphans' Court at
No(s):  114-2016

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and PELLEGRINI*, J.

MEMORANDUM BY McLAUGHLIN, J.:          FILED SEPTEMBER 24, 2019

C.B. ("Father") appeals from the order terminating his parental rights to M.B.B. ("Child"). We conclude the trial court did not abuse its discretion when it terminated his parental rights and therefore affirm.

T.M.R. ("Mother") and Father are the biological parents of Child (born October 2012). Although not married, Mother and Father previously resided together. In January 2013, when Child was three months old, Mother and Child left Father due to his addiction to heroin. Trial Court Opinion, filed Mar. 12, 2019, at 3-4 ("Trial Ct. Op."). Mother has since married A.G., with whom she has been in a relationship since August 2013. Id. at 3. Mother and A.G. have a child, E.G., born September 2017. Id.

Custody proceedings were initiated in July 2013. Mother had primary physical custody, and Mother and Father shared legal custody. Various custody orders were entered, with most providing that Father would have

_____
*   Retired Senior Judge assigned to the Superior Court.

supervised times of partial custody. The visits were supervised due to concerns for Child's safety because of Father's addiction. Id. at 5.

During the weekend of March 18-20, 2016, Father had unsupervised custody of Child from Friday night to Sunday. Id. at 9-10. Mother testified that, because she had a bad feeling about the weekend, she went to Father's residence early on Sunday to transfer custody. She testified that it was a cold morning, but that, when she arrived, she saw Father dressed only in a t-shirt and basketball shorts and Child on the sofa in a tank top and shorts. Id. at 10. Mother, based on her prior experience with Father's addiction, concluded he was under the influence of drugs. Id. He had blotches on his face that were bloody, had pinpoint pupils, was incoherent, and incapable of safely supervising Child. Id. Mother testified that when she went to her car to call Father's Mother, Father brought Child to the car in the tank top and shorts. N.T., Jan. 29, 2019, at 81, 240.

Father testified that on March 20, 2016, Mother arrived early, saying Child had a play date. N.T., Jan. 30, 2019, at 109-110. Father told Mother that Child could not leave yet, as his time had not ended. Id. However, Child wanted to go, so he dressed Child and took her to Mother's car. Id. at 110. He stated he was in basketball shorts and no shirt and Child wore pajamas because they had just woken up. Id. He testified that he was not under the influence of narcotics that weekend. Id. at 112.

This was the last time Father had unsupervised custody of Child. Trial Ct. Op. at 10. After the March 2016 visit, Mother and Father agreed to an

arrangement where Mother and A.G. would bring Child for supervised visits with Father. Id. The first supervised visit went well, but the five additional supervised visits between March 2016 and September 2016 did not. Id. at 10-11. Mother and A.G. testified that Father had track marks and seemed high during the visits, and after the first visit, he was "progressively less interested in parenting." Id. at 11. Father testified the visits were too structured and claimed he could not parent Child because Mother and A.G. were hovering. Id. Father did not file any document in court to challenge the arrangement. Id. The last visit Father had with Child was around Labor Day weekend in 2016. Id.

Between April 2016 and September 2016, Father spoke to Child on the phone and FaceTimed with Child. Id. at 12. However, the court credited Mother's testimony as to these interactions. Id. She testified that the three-year-old Child "would not stand still for more than a couple minutes and . . . every time Father FaceTimed with [C]hild it was for no more than a couple minutes." Id. She stated the longer conversations were between Mother and Father.

From 2013 to 2016, Father had three arrests for driving under the influence of a controlled substance ("DUI"), including an arrest in April 2016. Id. at 6-7. In December 2016, he was arrested for a drug-related offense.

Mother and A.G. testified that Child views A.G. as her father, that they are bonded, and that he is involved in her life.

- 3 -

In September 2016, Mother and A.G. filed a petition to terminate Father's parental rights to Child. The trial court held a hearing in May 2017, after which the trial court terminated Father's rights. Father appealed, and this Court remanded because the trial court had not appointed an attorney to represent Child.

In March 2019, following a January 2019 hearing before a different trial judge, the court entered a decree terminating Father's parental rights. It concluded that Mother and A.G. had established by clear and convincing evidence that Father refused or failed to perform parental duties for a period continuing for at least six months prior to the filing of the petition, and that termination would be in Child's best interest. See Decree, filed Mar. 12, 2019; 23 Pa.C.S.A. § 2511(a)(1), (b). Father filed a timely Notice of Appeal.

Father raises the following issues:

> 1. The trial court erred in relying upon [Mother and A.G.'s] testimony to alleged incidents that occurred prior to the six month look back period.
>
> 2. The trial court erred in finding that Mother proved by clear and convincing evidence that Father evidenced a settled purpose of relinquishing parental claim to [Child] without making the requisite finding that Father made a deliberate decision to terminate his parent-child relationship throughout the statutory six-month period, as required by Pennsylvania law.
>
> 3. The trial court erred in finding that Mother proved by clear and convincing evidence that Father had refused or failed to perform parental duties, especially considering Father's physical custody periods continuing until three weeks before the petition to terminate was filed, and Father's telephone calls and text messages regarding

- 4 -

[Child] during the six (6) months preceding Mother's petition.

4. The trial court erred in relying on Father's criminal charges, rather than the disposition of his criminal cases, especially the incidents occurring in April and December 2016.

5. The trial court erred in finding that "where the rubber meets the road" is Father's addiction, and that Father's "past behavior is the best indicator of [his] future behavior," and thus terminating Father's rights solely on the basis of his addiction."

6. The trial court erred in finding that [Child's] best interests were served by terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(b).

Father's Br. at 5-6. Father has abandoned his first issue in his brief and we therefore will not address it. Id. at 5 n.1 (stating "Father is not pursuing this issue on appeal"). Father's remaining issues challenge the termination of his parental rights.

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. In re Adoption of K.C., 199 A.3d 470, 473 (Pa.Super. 2018). Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." Id. (internal quotation marks and citation omitted in In re Adoption of K.C.).

When we review termination of parental rights cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (quoting

*In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *In re Adoption of K.C.*, 199 A.3d at 473. A trial court decision may be reversed for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P.*, 47 A.3d at 826.

Our Supreme Court has explained the reasons for applying an abuse of discretion standard of review in termination of parental rights cases:

> [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Id.* at 826-27 (citations omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under Section 2511, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section

> 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

Id. (citations omitted).

In the present case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and 2511(b) of the Adoption Act.

Father argues the trial court erred in finding he had a settled purpose of relinquishing his parental claim to Child. The trial court, however, specifically stated that it did not make such a finding. Trial. Ct. Op. at 15. We therefore conclude this claim is meritless.

Father next claims the trial court erred in finding that he refused or failed to perform parental duties for at least six months before the filing of the petition to terminate. He notes that he exercised physical custody of Child in March 2016 and called or FaceTimed with Child one to two times per week. He also notes that prior to March 2016 he continually sought more time with Child.[1] Father argues that he had sought help and had a period of sobriety before a relapse in 2018, and that he has developed a sobriety plan.

_____

[1] Father also notes that he filed a petition for custody after Mother and A.G. filed the petition to terminate his parental rights. We cannot consider the filing of this petition, as it happened after the filing of the petition. 23 Pa.C.S.A. § 2511(b).

Section 2511(a)(1) provides:

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1). Further, with respect to section 2511(a)(1), "the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

"Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." In re B., N.M., 856 A.2d 847, 855 (Pa.Super. 2004). Further:

> Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life'.

- 8 -

Id. (quoting In re C.M.S., 832 A.2d 457, 462 (Pa.Super. 2003)). Parental duty requires that a parent "act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." Id. (quoting In re Adoption of Dale A., II, 683 A.2d 297, 302 (Pa.Super. 1996)). A parent is required to "utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." Id.

Here, the trial court concluded:

> Where the rubber meets the road in this case . . . is that during that entire time and continuing, essentially right up to the time when the father was incarcerated on the most recent criminal charge (or even to the date of the hearing), he has been a prisoner to his addiction and has allowed his addiction to totally dominate his life, his judgment, and the lives of those persons who are closest to him. The mother's testimony was compelling on how she would recognize that [Father] was addicted but attempted to enable him to parent, and the mother's testimony was convincing that she made protracted and conscientious efforts to enable the father to remain involved in [Child's] life. In reaching the findings we come to in this case, we have to conclude that the father did not have control of his life during the relevant period and, in fact, did not have control of his life through November of 2018 when his probation was again revoked for heroin use while on probation supervision and he was locked up in jail. We hear it frequently said that it has become axiomatic that "a person's past behavior is the best indicator of their future behavior." . . .

Trial Ct. Op. at 15-16. The trial court noted that "[Father] is an intelligent, well-educated, responsible person when sober, but does not have control of his life because of his addiction." Id. at 16. It concluded that, although he

maintains sobriety while incarcerated, he has demonstrated "an inability to control his life, to control his addiction, and he has demonstrated that he is not motivated to parent this little girl by dealing responsibly with his addiction." Id. at 16-17. The trial court concluded that, during the relevant time period, Father did not make "a credible effort to parent. He has consistently failed to perform even the most basic parental duties." Id. at 17. It found "that the six (6) visits, which deteriorated and grew less and less beneficial for the child, were not a good faith effort to parent as contemplated in the act" and that "the telephone calls, which the father made were not an effort to parent as contemplated in the act." Id.

The court further addressed Father's claim that he agreed to the supervised format following the March 2016 visit because he did not want to go to court. Id. It stated that Father "would have [the court] accept and find that his desire not to go to court was beneficial for the parental relationship of the parties and ultimately for [Child]." Id. It noted, however, that if a parent's rights are being impaired by the conduct of the primary custody parent, the parent "should assert their right to get relief in court." Id. at 18. It noted that Father "did not seek to expand his time with the child but instead attended just six (6) visits, lasting about an hour, with [Child] which were not beneficial to her and which did nothing to maintain or reestablish any bond between her and [Father]." Id. The court concluded that Father "was so bogged down with his addiction and his additional criminal entanglements during the relevant period that parenting [Child] was not a priority in his life

and his parenting efforts were perfunctory." Id. It stated that it "[did] not for a minute doubt that the father loves his daughter and in some abstract aspect wants to parent, but [found] he made palpable choices that impaired his ability to parent and ultimately compelled the mother to decide to proceed to terminate because she had been up this road time and time again with his addiction." Id.

The court concluded:

> The child is entitled to permanency. And if the Court could plausibly make a finding today that [Father] was not going to re-engage in the cycle that has occurred several times since before the little girl was born as to his relapse due to addiction, we could respect his desire to parent and project benefit for [Child] to have her biological father involved in her life. We conclude that the likelihood of father recidivating, the likelihood of him again being unable to competently parent is overwhelming in this case. We therefore find this outcome is a function of his derelict behavior and the poor decisions that, he has made. The child deserves permanency and the father just cannot have the personal luxury of coming in and out of her life as his addiction vacillates.

Id. at 19-20.

The record supports the trial court's findings of fact and credibility determinations. Further, the trial court did not abuse its discretion in finding termination proper under Section 2511(a). Father suffers from an addiction to heroin. Although he has made efforts to overcome this addiction, those efforts have not yet been successful. Further, the addiction prevents Father from being able to parent Child.

In his next two issues, Father argues the trial court erred in relying on his criminal charges, rather than the criminal disposition of his cases, and erred in finding that his "past behavior is the best indicator of [his] future behavior," and therefore terminating his parental rights based solely on his addiction. Father claims that "[i]n applying the aforestated mantra," the court found Father demonstrated "an inability to control his life, to control his addiction, and . . . demonstrated that he is not motivated to parent this little girl by dealing responsibly with his addiction." Father. Br. at 35 (quoting Trial Ct. Op. at 35). Father argues he testified regarding the efforts he made to obtain and maintain sobriety, which show he is motivated to parent Child. He argues that in March 2016, when Mother claimed he was using, Father dressed Child and took her to Mother's car. He further argued that, even if the court credited Mother's version of the March incident, one "instance of improper care is insufficient to permanently sever Father's parental rights." Id. at 36.

Father's claim lacks merit. The evidence establishes that Father struggles with addiction, and that this addiction has prevented him from being able to parent Child. The court did not err in considering evidence of his addiction and finding the addiction had prevented Father from parenting Child.

In his final issue, Father argues that the court erred in finding termination of his parental rights would be in Child's best interest. He argues that he should be involved in Child's life because she can benefit from him intellectually, as he has obtained college and post-college degrees and "he can help her develop the fundamentals and help her throughout the rest of her life

with educational pursuits in performing well and her academics." Father's Br. at 38 (quoting N.T., 1/30/19, at 150). He also argued he would never stop loving Child and that she can benefit from him spiritually because of his addiction struggles, as he can teach her about "humility, perseverance, and integrity." Id. (quoting N.T., 1/30/19, at 150-51).

Under Section 2511(b), the court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the child's best interest. See 23 Pa.C.S.A. § 2511(b). The focus under Section 2511(b) is not on the parent, but on the child. In re Adoption of R.J.S., 901 A.2d 502, 514 (Pa.Super. 2006). This Court has explained that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." In re C.M.S., 884 A.2d 1284, 1287 (Pa.Super. 2005). The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." Id. Importantly, "[t]he mere existence of an emotional bond does not preclude the termination of parental rights." In re N.A.M., 33 A.3d 95, 103 (Pa.Super. 2011). Instead, the trial court "must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship." Id. (internal quotation marks and citation omitted).

Here, the trial court found:

> Overwhelming evidence was presented by [Mother and A.G.] that [A.G.] has been . . . [Child's] ever-present, dependable and loving father (figure). The record is replete

- 13 -

with evidence that [Child] is bonded with her stepfather. There were numerous pictures presented . . . which showed the relationship between the stepfather and [Child]. [Child] may at one point way back have had some form of a bond with [Father], but that has dissipated if it ever existed and per the mother's credible tesmony does not exist at this time.

Trial Ct. Op., at 20-21. The court noted Father presented photographs showing Child happy when with him, but found the pictures were "dated." Id. at 21. The court concluded there was no evidence that a bond between Father and Child exists at this time. It concluded that:

Weighing the needs of this child for permanency, taking into account her present auspicious situation in life with the very powerful bond with her stepfather, that the risks of allowing [Father] back in and his dangerous cycle of "in again, out again," outweighs our taking the chance to allow him to continue to parent, and we find clearly that the best interests of [Child] are to allow the stepfather to adopt and become the legal parent.

Id. at 22.

The evidence supports the trial court findings. Father has had minimal contact with Child since March 2016, and A.G. has been a central figure in Child's life. The trial court did not abuse its discretion in finding termination would be in Child's best interest

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  9/24/2019

- 14 -